I'm Catherine Hart, representing petitioner Stacey Dyer, and I would ask that two minutes be reserved for rebuttal. Keep track of your time. And mindful of your admonition that I'm responsible, I will try to keep track, but I usually forget. This is... Judge Smith, they haven't started the clock running here yet. Oh, I'm sorry. Let's get the clock started.  Hold on one second. But you get a fresh start here. All right. Okay. Let us know when you're ready. Ready? Okay. Go ahead, then. Did I start to run before the firing gun was fired? That's right. Exactly. Therefore, I'm defeated in this Olympics. All right. Okay. Is that your fault? This is a blatant and egregious violation of Miranda rights. And unfortunately, the State court decision simply did not grasp Federal precedent. I realize, Your Honors, there is a huge burden for a Petitioner in habeas under the AEDPA. I have to persuade you that there was a clear departure from Federal law, existing Federal law at the time of the decision, or I have to show that there was an unreasonable determination of facts in light of the evidence before the State court. Both prongs are satisfied in this case, even though it's a high standard. We have to go back to the State court decision, which was the Fifth District Court of Appeal, the last State court reasoned decision in this case. The Fifth District Court of Appeal ignored clearly established Federal precedent. For example, the case of Stansbury v. California, which the Fifth District relied on, the Stansbury case had to do with an individual who was talked to as a witness, and it was at about 11 o'clock at night that Mr. Stansbury was taken in a patrol car, or at any rate, he was taken by law enforcement, and he was taken to police headquarters for questioning as a witness. Within a short time, he began to give incriminating information, something about a turquoise vehicle, at which time law enforcement read him his Miranda warnings. So Stansbury doesn't assist the Fifth District Court of Appeal in their ruling because in Stansbury, Miranda warnings were read to the individual once the individual had given some incriminating information that said that he was now a suspect and no longer a witness. Counsel, I'll tell you candidly that I have, I'm very troubled with what happened here. The issue, the whole issue seems to be whether she was in custody, and here you've got a person who was taken in out in a rural area at midnight. She was taken on a 30-minute drive to the police station in the back of a locked squad car. She was 25 minutes before that in a locked squad car while they were serving the search warrant and was not allowed to leave. She was interrogated for four hours in a locked room by two male detectives who repeatedly confronted her with substantial allegations of guilt and repeatedly implicated her in the death of Hunter. That's a lot of stuff. In terms of whether she was in custody, I'm very troubled by it, but I must say the – what I have to get over is the AEDPA issue, which you mentioned earlier. Can – if this were a direct appeal, no question in my mind she was in custody. None. But I'm troubled on the AEDPA part of it because we have to determine, and the Supreme Court has to defer to the reasoned decisions of State courts. Was what the State court did unreasonable? That's really what we have to conclude. Given the case law that was out there, was it unreasonable? What can you tell us that helps us get past – at least me – get past that hurdle? Because that's what I'm stuck on. Yes. I tried to address that. By the way, Your Honor, one of the detectives was a female. That is Janice Rasmussen, one of the detectives. Mark Chapman was a male. Just – I hate to correct you. No, I appreciate you doing that. That's not to your benefit, but that doesn't – that's the way it is. In terms of what can I tell you about why it was unreasonable? Because it was such a clear departure of United States Supreme Court authority. What cases would you particularly rely upon to help us understand that Federal law with respect to custody and the requirement of a Miranda warning? What's the – what are the best case or cases you have to get us over the hurdle? Well, the Stansbury case that I just mentioned is, I believe, probably the best case because that had to do with somebody who was taken in a patrol car. And the District Court of Appeal, Fifth District Court of Appeal in California, relied on Stansbury, didn't it? Relied on Stansbury without any elucidation whatsoever of the facts, without even referring to the fact that in Stansbury the individual was given Miranda warnings. I think if you go back to the original Miranda case, and you go back to the original foundation of Bedrock Miranda, and you look at Chief Justice Earl Warren and his pronouncement, and I know that parts of Miranda have been whittled away a little bit here and there, but if you go back to the original case, Miranda talks about an individual being swept. That was the language used by Earl Warren. The individual being swept from familiar surroundings into an isolated situation and confronted by adversarial forces. Now, Judge Warren, Justice Warren uses very hyperbolic language about the individual being swept away into an isolated area, but that is what we have here. So I think if you look at the original Miranda case, you see an individual who is taken from familiar surroundings, her home. She's outside where a search warrant is being executed. And it did the whole sequestration, the whole custody did start at about 1045 that night. One of the things I'd like to get to in answering your question is how can I assist you in determining that the State court, the State court also, Your Honors, had an unreasonable determination of facts based on the evidence. So the State court, first of all, said, well, it doesn't matter that a search warrant was being executed because one can be detained as part of a search warrant. The State court said that Stacey Dyer was free to move about freely. That is totally the lie. This is when she was locked in the back of a patrol car, right? Well, the evidence is that she was in the back of a patrol car and that when she was seated there with Deputy Simpson in the patrol car, that she could not have unlocked the patrol car. We don't ---- Stand. Excuse me for a minute. Stay on that point. Wasn't she told repeatedly, whether it was true or not, wasn't she told repeatedly when she was in the police station that she was free to leave? Absolutely not. At the very beginning of the interview, she was told she was free to leave. The district court made an erroneous factual conclusion when the district court said she was told many times that she was free to leave. A careful inspection of the interview with her discloses that she was told at the very beginning of the interview that she was free to leave, but it was not repeated throughout the whole accusatorial inquisition.  And then another error that the district court made. How do we know that? I mean, where in the record do we know that? What do we know that? What's your evidence to back that up? Oh, that is page ---- Excerpt of record two is where the entire interview is with Stacy Dyer. And ---- You say that appears only once, that you are free to leave. She only appears once in that excerpt of record two. That's my reading as well. But what she said, was she told something when she was out at her home and before she, in quotes, volunteered to come to the police station? She did agree. What I mean, was she told she was free to leave there? There's no evidence that she was told that she was free to leave. She was in the patrol car with the Deputy Simpson when the detectives, when Detective Chapman came and asked her if she would be willing to go to headquarters, Fresno County Sheriff's Office, if she would be willing to go so that they could interview her. And she acquiesced in that. She was not ---- there's no evidence she was told she was free to leave at that point. If you want to save some of your time, you're down to 115. Oh. Do you want to save some? Yes, of course.  Oh, thank you. Let's hear from the government. May it please the Court. William Pym for the appellee. The Supreme Court precedent only requires that the Court consider and weigh all the circumstances around the interrogation. There is no Supreme Court precedent that holds any factor is dispositive or any factor is ---- weighs more than any other factor. Counsel, do you agree if this were a direct appeal, you'd lose? No, Your Honor. Even under Ninth Circuit law, I believe we'd be ---- we'd prevail. Why is that? Well ---- The issue is whether the woman was in custody. Yes, Your Honor. And even the slightest bit of common sense would tell you that this woman was not free to go and that she was in custody. I mean, she's locked in the back of a police car, got all these police people around with guns. She's invited to go to the police station. She says, that's okay. I mean, we've recited some of this before. How can you say that under a direct appeal that she would not be in custody? There's a lot of factors that you and Ms. Harden were discussing. And let's start with the being locked in the back of a patrol vehicle. The State court did consider that factor and found that it had little bearing on the custody determination. And that was a reasonable conclusion. A reasonable person would understand that detention would be temporary. A reasonable person would not believe that the detention would extend for a significant period of time. Okay. Well, let's isolate that, then, like the State court of appeal did. Let's put that out there. Okay. Moving forward, how is that ---- Yes. How was she not in custody? Well, there are many critical factors. First, is she voluntarily accompanied? Come on. Voluntarily. She's out there. They're accusing her of murder. And they're searching her house. She's in the back of a police car. She didn't volunteer to go. She went because she thought she was intimidated. She went. She got down there. The question is whether she was legally in custody. I think a critical part of this inquiry is we have to look at this through the lens of a suspect in Ms. Dyer's position. And that person has to be a reasonably innocent person. Excuse me? We cannot ---- We cannot presume that she is a reasonably innocent person. What's that? A reasonable innocent person is under the United States Supreme Court case of Florida v. Bostick, it's a Fourth Amendment case that says the reasonable person presupposes an innocent person. And that has been extended by the circuits, including this circuit, to the Fifth Amendment in the Miranda context. So if you're Ms. Dyer, you're sitting in the car, you have to be aware Mr. Ortega was also arrested at that home. I'm a reasonably ---- I'm a reasonably innocent person, particularly in this case. And I'm sitting in the back locked ---- essentially locked up. Yes. Reasonably innocent though I am, do I really think ---- and there's a murder investigation going on. They put me in the car. Do I really think, oh, okay, I'll open the window and hop out? Oh, absolutely not. You're absolutely correct, Your Honor. But that freedom of movement test, it's been often used also in the Fifth Amendment context for free to leave, free to terminate the interrogation and leave. But that the Supreme Court has been clear, the test is actually whether there's been formal arrest or there's been restraint on a person's freedom of movement to the degree associated with the formal arrest. And in this situation, just because you're not free to leave in the Fourth Amendment context does not mean you're in custody for Fifth Amendment context. And so this has very little bearing. I'm not ---- What's the dividing line between the two? I'm sorry? What is the ---- excuse me. What is the dividing line between the two that you ---- I would love to give you like a very clear cut, but in a totality of circumstances case, it's ---- every case is unique. And this is a totality of the circumstances case, is it not? And this will be a very unique. I want to bring out, for instance, about the 11 o'clock. It's 12 o'clock in the morning. If this has been you or I, we go to sleep 9, 10 o'clock. That would be a different story. But if you look at the facts of this case, particularly when trial counsel was arguing this suppression motion at trial, she mentioned Detective Chapman was very tired on the tape. There's no mention that Ms. Dyer was tired. And if you look at the facts of the case, you understand these kids were up, these 20, 21-year-old kids were up at 2 in the morning calling each other, and they didn't waken each other up. They were up hanging out, doing whatever. This is the ---- they're night owls. That 11 o'clock, 12 o'clock in the morning ---- So this is the night owl custody exception you want us to enact? Well, I think the point here is every case is unique. We can't just put, oh, you know, a reasonable person at 11 o'clock would be tired and they're dragging and drawing. Counsel, Judge Gould, if I could interject a question, please. So am I right, she was told you are not in trouble? Yes. And when was that? When was she told that? At the outset of the interview. She voluntarily accompanied the detectives to the police station, and before the questioning started, the questioning started, they told her she was not in any trouble, she was not under arrest, and she was free to leave at any time. That did only appear once, and then at the very end, she did request to go home, and that's when they said, you are free to go, and she said, I want to go home. She said it again, and that's when they ended it. That's when they said surprise. Yes. But they had previously told her, and I need to know, I need you to tell me at what point did they tell her that they thought she was associated with the murder of Hunter? I think it's about an hour, an hour and a half in after they initially just kind of gave very neutral, objective questions. Did you know D.J. Hunter? Did you know so-and-so? And at some point, about an hour, an hour and a half in, the detectives started saying, hey, look, we do our homework. You're lying to us. And they gave her that. There's no doubt they brought incriminating evidence before. And at that point, if not before, you had this relatively young woman in a police station in the middle of the night. Interrogation lasted about four and a half hours, if I understand it correctly. Three and 45 minutes to four. Okay, four hours then. Yes. Long time. So an hour and a half in, they let her know, hey, we think you killed this guy. You were involved in the killing of this guy, in so many words. At that point, is she not in custody? No, Your Honor. I think the words they were suggesting is, hey, we've got people who are telling us that you were there, that you killed D.J. We're giving you a chance now. Don't let them put the blame on you. Here's your chance. Would they coerce you? Are you scared? And that's part of when, at the very end, the state court's opinion says, hey, where are you going to stay tonight? She says, I'm going to stay at home, but I'm scared. That really reinforces that point. They never said, you are the person we are targeting, and we think you're the one who pulled the trigger, or you're the one that was very much involved. So when they began doing the line of questioning that you're now talking about, at that time, too, she thought she was free to leave? She was what? I'm sorry. An innocent person would think that she was free to leave at the time they started to question her about her connection with the murder. A reasonable person in that circumstance would not consider themselves under custody at that point. A reasonable night owl, innocent person. And that reasonable innocent person, reason for that standard is, if you look at Stansberry, if it's not an innocent person, Stansberry would have very little meaning.   And if you look at Stansberry, even a clear statement from an officer that the person under interrogation, this prime suspect, is not in itself dispositive of the custody issue. For some suspects, they're free to come and go until the police decide to make a request. And it is one factor. If this person is not in it, the reasonable person is not an innocent and includes a guilty person, then that would be dispositive. And police procedures, every time they bring some kind of incriminating evidence, investigatory tone, then that person would be guilty. So the standard, according to the government, then, is if the person is guilty, then you can do things differently than if the person is innocent. It has a different impact on the person. Is that right? No, Your Honor. The Fifth Amendment, Miranda, is not to protect the guilty from police interrogation. It's to protect the innocent and the guilty from custodial interrogation. Thank you for clarifying that for me, because I never had that understanding. You're saying that Miranda is not to protect the guilty. It's only to protect the innocent. It's to protect the innocent and the guilty from custodial interrogation. Okay. So the guilty gets involved, too. From the custodial interrogation. Guilty people have constitutional rights. Come on, counsel. You don't want to go into that. Absolutely, Your Honor. And this incriminating evidence, bringing the incriminating evidence, and the concern with a lengthy interrogation and where the incriminating evidence is brought forth repeatedly is if you ask the person long enough and you keep badgering them and you say, hey, we don't believe you, do we look like we believe in the Easter Bunny? And no matter what the reasonable explanation they give, they keep trying to force. It's the embassy, they say, hey, look, is this a marathon session trying to overcome the will and trying to force a confession, or is this an investigation asking questions and just seeing it did last from a long time, from 1 a.m. to 5 a.m., numerous activities, numerous people. I think my time is up. It is indeed. Thank you for your argument. Let's hear from counsel. We'll give her two minutes, okay? Oh, thank you. Another area in which the Fifth District erred and made an unreasonable determination of facts is that they considered the investigatory interview here, they determined that it was not accusatory. Now, there have been some questions there about when it was that Stacy Dyer was confronted. Yes, at the very beginning she was told that there was no problem, she wasn't a suspect, she was free to go. But by this is in excerpt 2 and page 14, so we're fairly early in that interview, not an hour into the interview. She is told, people know that you were involved. They say, and then they say, hey, by page 11, you've come up as someone very important in the investigation, very important. Page 13, you've been implicated by several people. We've corroborated that information. Then by page 14, they're saying you are responsible for D.J. Hunter's death. Two of them are saying this. And then it goes on. And how, in the, during the four-hour interrogation, how far into the investigation did these statements occur? The ones you just read at 14. These are at the very beginning. The very beginning. This starts at 12.15, and then it ends at 4. But by page 14 of the 12.15 interview, I don't have a time-by-time notation on when that occurred. But by page 14 of that interview, she's being confronted and being told. And then by page 34, other people have said you are the one who killed him. And then by page 35, I know you were there. Then there's a discussion about a boy murdered, gasoline thrown. Finally, at page 48, which is about an hour into the interview, at I think it's 155 to 159, she's saying she feels nervous talking to both of them. And then one of the detectives says, can I get you some water? And they take this five-minute break where she goes to the restroom. But the ---- Escorted or unescorted? Well, do you know, there we don't have any evidence that she was escorted. Stacey Dyer herself and Barbara O'Neill, the trial attorney, tried to bring that up later on, that Stacey Dyer wanted to reopen the hearing to say that she was escorted. So we don't have evidence in the record as to whether she was escorted or not. But we do have an important statement in the record after the five-minute break where the detective says, we took a break and we went and got you. And I pointed out in my argument as tending to suggest that when she took the break that they went and got her. But we don't know for sure whether she was escorted or not. We do know that it was about 90 feet that she's there when that break is taken. It's 2 in the morning, 90 feet. She's inside police headquarters with the two detectives. Yes, she's not handcuffed, but there's no ---- This fits in with Miranda because she's isolated. There's no way that she can go out and hail a taxi cab or hail a bus or leave at 2 in the morning. She's captive. She's isolated. And she has been accused, and she is a suspect. Now, my argument is that Miranda should have started at the very initial phase of her detention in there. But if this Court doesn't agree with that, at least early in the interview, she is confronted as being a suspect. And all U.S. Supreme Court authority in both the Oregon v. Mathiason case, the Stansbury case, once the suspect is clearly a suspect, then Miranda starts. One more area that the Fifth District ---- We ---- I regret having to stop you. Of course. You've both done a fine job, and we appreciate that. Unless either of my colleagues have further questions, we'll thank you both. The case just argued is submitted. Thank you, Your Honors. And we're adjourned.
judges: Sack, Gould, Smith